UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                    :

TRAVIS RHODES,                      :

                Plaintiff,       :

                                :            25-CV-6269 (JMF)

        -v-                :

                                :           OPINION AND ORDER

BRISTOL-MYERS SQUIBB COMPANY,  :

                Defendant.    :

                                :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case is another chapter in a long-running $6.7 billion dispute arising out of the November 2019 acquisition by Bristol-Meyers Squibb Company ("BMS") of Celgene Corporation ("Celgene"). In connection with the acquisition, BMS issued to Celgene shareholders contingent value rights, or CVRs, which would have value only if the Food and Drug Administration ("FDA") approved marketing applications for three of Celgene's most valuable drug products by specified milestone dates. When the FDA failed to approve one of the drugs, the CVRs expired worthless, and several lawsuits followed. The first two of those lawsuits were brought by UMB Bank, N.A. ("UMB"), the putative Trustee for the CVR holders. The Court dismissed the first of UMB's cases after concluding that it had not been properly appointed as Trustee, *see UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 21-CV-4897 (JMF), 2024 WL 4355029, at *13-14 (S.D.N.Y. Sept. 30, 2024) ("*UMB I*"), a decision that is currently on appeal, *see UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 24-2865 (2d Cir. appeal docketed Oct. 29, 2024, argued Dec. 5, 2025). The Court allowed the second case brought by UMB to proceed, *see UMB Bank, N.A. v. Bristol-Myers Squibb Company*, No. 24-CV-8668, 2025 WL 3442747, at *1-2 (S.D.N.Y. Dec. 1, 2025) ("*UMB II*"); *see also UMB Bank, N.A. v.*

*Bristol-Myers Squibb Company*, No. 24-CV-8668 (JMF), 2026 WL 1257350 (S.D.N.Y. May 7, 2026) (denying a reconsideration motion), and the parties are in the middle of discovery.

In contrast to those cases, this case is not brought by UMB as putative Trustee for the CVR holders. Instead, it is brought by Travis Rhodes, who was the beneficial owner of one million CVRs. He brings claims for breach of the agreement governing the CVRs (the "CVR Agreement") — namely, that BMS violated the Agreement when it took steps to frustrate his ability to coordinate with other beneficial owners of CVRs to appoint a Trustee who could bring suit on their behalf — as well as a claim for breach of the implied covenant of good faith and fair dealing and tort claims. *See* ECF No. 1 ("Compl."). BMS now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint for failure to state a claim. *See* ECF No. 16; *see also* ECF No. 17 ("Def. Mem."), at 1-3. It argues that, under the plain language of the CVR Agreement, Rhodes lacks "contractual standing" to bring his claims. Def. Mem. 9-15. For the reasons that follow, the Court agrees and, therefore, grants BMS's motion to dismiss.

## BACKGROUND

The Court assumes familiarity with its decisions in *UMB I* and *UMB II* and, by extension, the relevant background. In brief, BMS issued $6.7 billion of CVRs to Celgene shareholders that expired worthless because the FDA failed to approve one of the drugs by a specified milestone date. Compl. ¶ 6. As discussed in more detail below, the agreement governing the CVRs (the "CVR Agreement") generally provides that any lawsuit to enforce the CVR holders' rights must be brought by the Trustee. *See* ECF No. 18-1 ("CVR Agrmt."), §§ 8.1, 8.4, 8.6. UMB brought *UMB I* and *UMB II* in that capacity, arguing, among other things, that BMS breached the CVR Agreement by failing to use "Diligent Efforts" to get the drug approved on time.

2

This case, by contrast, is brought by Rhodes, an "investment professional" who, along with his wife, was the beneficial owner of one million CVRs. *See* Compl. ¶¶ 38-39. On April 14, 2025, as the litigation over UMB's status as Trustee was unfolding, Rhodes — through his broker J.P. Morgan Securities LLC ("J.P. Morgan") — sent letters to the Depository Trust Company ("DTC"), the Registered Holder of the CVRs, requesting that the DTC sign certain "confirmation of position letter[s]" with respect to his accounts. *See* ECF No. 1-1 ("DTC Letters"), at 2, 4. In letters signed on April 21, 2025, DTC confirmed "that its books and records reflect" that, on January 18, 2021, J.P. Morgan's account held one million CVRs, and noted that J.P. Morgan had advised that those CVRs were "beneficially owned" by Rhodes and his wife. *See id.* at 3, 5. Rhodes characterizes those letters as "formal delegation[s] from DTC," Compl. ¶ 18, making him a CVR "Holder," a term defined by the CVR Agreement as "a Person in whose name a Security is registered in the Security Register," CVR Agrmt. § 1.1.

Perhaps dissatisfied with the slow pace or uncertainties of the litigation brought by UMB, Rhodes filed his own Complaint against BMS in this case on July 30, 2025. He alleges that BMS (1) breached various provisions of the CVR Agreement (Counts I and II), Compl. ¶¶ 120-28; (2) breached the implied covenant of good faith and fair dealing inherent in the CVR Agreement (Count III), *id.* ¶¶ 133-37; (3) wrongfully converted his CVRs (Count IV), *id.* ¶¶ 138-44; and (4) tortiously interfered with his prospective economic advantage (Count V), *id.* ¶¶ 145-50. He seeks a declaration that BMS violated the CVR Agreement and an injunction directing BMS to reactivate the system for managing CVRs and the CVRs themselves. *Id.* ¶¶ 151-56. BMS now moves to dismiss, arguing, among other things, that Rhodes may not bring suit under the CVR Agreement — that is, that he lacks "contractual standing."

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319-20 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). A court may not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Likewise, "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam). Ultimately, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

## DISCUSSION

As noted, Rhodes brings two types of claims: (1) contractual and quasi-contractual claims that BMS breached the CVR Agreement and the implied covenant of good faith and fair dealing inherent therein, Compl. ¶¶ 120-37; and (2) tort claims premised on BMS's alleged interference with the system used to manage the CVRs, *id.* ¶¶ 138-50. The Court will address each in turn.

4

### A.  Contract and Quasi-Contract Claims

BMS argues that Rhodes's contractual and quasi-contractual claims must be dismissed because he lacks "contractual standing" to bring them.  *See* Def. Mem. 1.  Contractual standing "asks . . . whether a party has the right to enforce a contract"; it is "distinct from Article III standing and does not implicate subject-matter jurisdiction."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  In response, Rhodes does not — and could not — dispute that the CVR Agreement bars beneficial owners of CVRs from bringing contractual claims against BMS for breach of the Agreement.  *See* CVR Agrmt. § 1.9 (expressly disclaiming "giv[ing] to any Person (other than . . . the Holders) any benefit or any legal or equitable right, remedy or claim under this CVR Agreement").  Instead, he argues that the DTC Letters authorized him to act as a "Holder" within the meaning of the CVR Agreement and that he has contractual standing to bring his claims based on that status.  *See* ECF No. 22 ("Pl.'s Opp'n"), at 9-10.

That argument fails on at least two levels.  First, Rhodes is not actually a Holder within the meaning of the CVR Agreement, despite his conclusory allegation to that effect.  *See* Compl. ¶ 18; *see, e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (observing that a court is not required, in ruling on a Rule 12(b)(6) motion, to credit "conclusory allegation[s] in the complaint [that are] contradicted by a document attached to the complaint").  As noted, the CVR Agreement defines a "Holder" as "a Person in whose name a Security is registered in the Security Register."  CVR Agrmt. § 1.1.  But the DTC letters upon which Rhodes relies to support his allegation confirm only that his broker J.P. Morgan's accounts held one million CVRs as of January 18, 2021.  *See* DTC Letters 3, 5.  They do not state that any of the CVRs were registered in Rhodes's name in the Security Register.  Nor do they state that the Registered Holder, DTC, or its nominee, Cede & Co., delegated any authority

or granted any rights they had as Holders to Rhodes.  Rhodes maintains that the letters need not

use "'magic words' such as 'delegate' or 'authorize'" to prove that he is a Holder because it is

enough that they illustrate he had an "economic stake in and control over the [CVRs] at issue."

Pl.'s Opp'n 10.  But that proves too much.  If an "economic stake in and control over" CVRs

were sufficient to qualify one as a Holder, every beneficial owner of CVRs would be a Holder.

That is inconsistent with the plain language of the CVR Agreement.  *See UMB I*, 2024 WL

4355029, at *6.  And while magic words may not be necessary for DTC authorization, it is

telling that Cede & Co. signed numerous letters in connection with the efforts to reconfirm UMB

as Trustee that expressly "authoriz[ed]" brokers (and therefore beneficial owners like Rhodes)

"to take any and all actions and exercise any and all rights and remedies that Cede & Co., as the

holder of record . . . is entitled to take."  *E.g.*, *UMB Bank, N.A. v. Bristol-Myers Squibb

Company*, No. 24-CV-8668 (JMF), ECF No. 45-13, at 4.[1]  The lack of any comparable language

in the DTC Letters is striking and undercuts any inference that Rhodes is a Holder.

Second, and in any event, even if Rhodes were a Holder within the meaning of the CVR

Agreement, the plain language of the Agreement would bar him from bringing his contractual

claims.  Section 8.6, which is titled "Limitations on Suits by Holders" provides:

> Subject to the rights of the Holders under Section 8.7, *no Holder of any Security
> shall have any right by virtue or by availing of any provision of this CVR
> Agreement to institute any action or proceeding at Law or in equity or in
> bankruptcy or otherwise upon or under or with respect to this CVR Agreement,
> or for the appointment of a trustee*, receiver, liquidator, custodian or other
> similar official or for any other remedy hereunder, unless such Holder
> previously shall have given to the Trustee written notice of default and of the
> continuance thereof, as hereinbefore provided, and unless the Majority Holders
> shall also have made written request upon the Trustee to institute such action or
> proceedings in its own name as trustee hereunder and shall have offered to the

---

[1]  Courts "routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

> Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for fifteen (15) days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceeding . . . .

CVR Agrmt. § 8.6 (emphasis added).  Provisions like Section 8.6 are commonly referred to as "no action" clauses and are included in trust indentures like the CVR Agreement "to protect issuers from the expense involved in defending individual lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors."  *Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 200 (N.Y. 2018) (internal quotation marks omitted).  They achieve that goal "by delegating the right to bring a suit enforcing the rights of [holders] to the trustee, . . . and by delegating to the trustee the right to prosecute such a suit in the first instance."  *Id.* at 201 (internal quotation marks omitted).

By its terms, Section 8.6 prevents Holders from bringing suit for breach of any provision of the CVR Agreement (or for the purposes of "appoint[ing] a trustee") unless two conditions are met: (1) the Holder gives the Trustee written notice of default; and (2) the Majority Holders — defined by the CVR Agreement as "Holders of at least a majority of the Outstanding CVRs" at "the time of determination," CVR Agrmt. § 1.1 — request the Trustee bring suit and the Trustee refuses to do so within fifteen days.  CVR Agrmt. § 8.6.  Rhodes, however, does not allege that he has satisfied either of those conditions.  Instead, he claims that he is excused from doing so because — by deactivating the DTC system and preventing him from joining with other Holders — "BMS's own conduct has frustrated Rhodes's ability to comply with them."  Pl.'s Opp'n 15; *see* Compl. ¶ 35.  But that bare allegation ignores the fact that Rhodes *was* able to join with the Majority Holders in reconfirming UMB as the Trustee, *see UMB II*, 2025 WL 3442747, at *6-9, and, in any case, it does not bear on Rhodes's ability to comply with the straightforward requirement that he provide the Trustee with notice of default.  It is therefore insufficient to

excuse his failure to satisfy the two preconditions.  Accordingly, Section 8.6 bars Rhodes from bringing his contractual claims even if he qualifies as a Holder.

Perhaps recognizing as much, Rhodes invokes several other provisions of the CVR Agreement — specifically, Sections 3.5, 8.7, and 8.8 — along with the implied covenant of good faith and fair dealing as alternative bases for his contractual standing to sue as a Holder.  *See* Pl.'s Opp'n 2.  But none of them aid his cause.  To begin with, Section 3.5 of the CVR Agreement obliges BMS to keep a "Security Register" at the office of the Trustee and to establish a system for the exchange and transfer of CVRs.  *See* CVR Agrmt. § 3.5.  Rhodes alleges that BMS violated this provision by "disabl[ing] the DTC system with respect to the CVRs," Pl.'s Opp'n 16 (citing Compl. ¶ 29), but he does not identify any language in the provision that gives Holders a freestanding right to bring suit for alleged violations of the provision.  Nor could he, because, as discussed, Section 8.6 makes it clear that "no Holder . . . shall have any right *by virtue or by availing of any provision of this CVR Agreement* to institute any action."  CVR Agrmt. § 8.6 (emphasis added).  Section 3.5 does not help Rhodes.[2]

At first glance, Section 8.7 might appear to provide Rhodes with a more solid foundation for bringing suit.  After all, Section 8.6's prohibition on Holder suits contains a limited carveout for suits brought to enforce the "rights of Holders under Section 8.7."  *Id.*  And Section 8.7, in turn, permits Holders "to institute suit for the enforcement of" payments "of the amounts payable in respect of" CVRs "notwithstanding any other provision in th[e] CVR Agreement."  *Id.* § 8.7.  This provision is required by Section 316(b) of the Trust Indenture Act, 15 U.S.C. § 77ppp(b), and, as its terms suggest, permits Holders to bring individual suits to collect the amounts they are

---

[2]    In any event, this Court recently held that Section 3.5 did not survive termination of the CVR Agreement.  *See UMB II*, 2025 WL 3442747, at *10.  So even if that provision somehow gave Rhodes contractual standing, it would not provide a path to relief.

owed (plus interest) if the preconditions that confer CVRs with value are satisfied.  *See Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 7, 16 (2d Cir. 2017) (explaining that Section 316(b) protects only the "core payment rights" of Holders, which are, in turn, defined as "the amount of principal and interest owed, and the date of maturity").[3]  Rhodes, however, does not bring suit to enforce the payment of the principal and interest owed in respect of CVRs.  Nor could he, as the conditions for giving value to the CVRs set under the Agreement — approval of the three Celgene drugs — were not satisfied, and the CVRs expired valueless. *See* Compl. ¶¶ 8, 51.  Thus, Section 8.7 provides no basis for Rhodes to bring his suit.

Rhodes attempts to resist that conclusion by seizing on the "amounts payable in respect of" language in the provision.  CVR Agrmt. § 8.7.  He interprets that clause to mean that Holders have the ability to sue to enforce "the[ir] right to appoint and direct the Trustee to sue to collect amounts that would have been paid, but for the malfeasance of BMS," and "for anything that would impair or affect a Holder's right to cause the Trustee to bring an enforcement action." Pl.'s Opp'n 11-12.  But in doing so, he "read[s] too much into too little."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023).  His proposed interpretation would contradict Section 8.6, which flatly prohibits Holders from bringing suit "for the appointment of a trustee," CVR Agrmt. § 8.6, and would thus have the practical effect of "let[ting] the payment exception swallow the no-action clause," *Waxman v. Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 294

---

[3]    Rhodes cites *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 517-18 (S.D.N.Y. 2015), for the proposition that clauses like Section 8.7 "unconditionally protect against anything that would impair or affect a Holder's right to cause the Trustee to bring an enforcement action."  Pl.'s Opp'n 13 (cleaned up).  But *MeehanCombs* predated *Marblegate Asset Management*, which expressly rejected the existence of such a sweeping right.  *See* 846 F.3d at 17 ("[Plaintiff] cannot invoke Section 316(b) to retain an 'absolute and unconditional' right to payment of its notes." (quoting *Bank of New York v. First Millenium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010)).

(S.D.N.Y. 2016) (quoting *Emmet & Co. v. Catholic Health E.*, 951 N.Y.S.2d 846, 859-60 (N.Y. Sup. Ct. 2012), *aff'd*, 980 N.Y.S.2d 762 (N.Y. App. Div. 1st Dep't 2014)).  That would violate the "recognized rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect."  *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 177 (N.Y. App. Div. 1st Dep't 1995) (cleaned up).  Rhodes attempts to distinguish *Waxman* and *Emmet* on the ground that the plaintiffs in those cases sought money damages while he seeks "exclusively declaratory and injunctive relief . . . so the Trustee can bring an action for money damages."  Pl.'s Opp'n 14.  But his interpretation of Section 8.7 would apply with equal force to a claim for money damages and, in any case, still does not grapple with Section 8.6's express prohibition of Holder suits brought "for the appointment of a trustee."  CVR Agrmt. § 8.6.

The Second Circuit's decision in *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 24-1209, 2025 WL 1949968 (2d Cir. July 16, 2025) (summary order), underscores the point. There, the Second Circuit rejected an attempt by plaintiffs who held certain contingent securities to circumvent a similar "no action clause" by invoking another provision that, like Section 8.7, gave security holders the right to bring suit to enforce payment of principal and interest.  *See id.* at *4.  It held that any amounts purportedly owed on the securities could not constitute principal nor interest because the "payments are not guaranteed, are not owed in compensation for use of the plaintiffs' funds, and are not calculated as a percentage of money invested or lent."  *Id.* at *2. And it further rejected the plaintiffs' attempt to expand the scope of that provision by reference to a clause stating that they could bring suit "with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder."  *Id.* at *1.  The court observed that the plaintiffs' reading of the "'with respect to' clause," would render the limitations in the provision

10

permitting Holders to bring suit for principal and interest "both superfluous and contradictory." *Id.* at \*3.  That conclusion applies with equal force to Rhodes's attempt to use the "in respect of" clause to transform Section 8.7 from a limited carve-out of Section 8.6's bar on Holder actions to a wholesale grant of contractual standing for Holders to bring suit for any action that "would impair or affect a Holder's right to cause the Trustee to bring an enforcement action."  Pl.'s Opp'n 12 (cleaned up).  Accordingly, the Court rejects Rhodes's reading of Section 8.7.

Rhodes's reliance on Section 8.8 fails as well.  That provision merely preserves the "cumulative remedies" of Holders and expressly incorporates Section 8.6's limitations in both of its relevant subparts.  *See* CVR Agrmt. § 8.8(a) ("*Except as provided in Section 8.6*, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy . . ."); *id.* § 8.8(b) ("*subject to Section 8.6*, every power and remedy given by this CVR Agreement or by Law to the Trustee or to the Holders may be exercised from time to time") (emphases added)).  As the Court has already held that Rhodes lacks contractual standing to bring his claims under Section 8.6, it follows that Section 8.8 cannot provide him with contractual standing either.  Rhodes's only response is to argue that Section 8.8 preserves his right to bring a claim under Section 8.7, *see* Pl.'s Opp'n 15, but, as discussed, that provision does not provide Rhodes with independent recourse.

Finally, Rhodes invokes the "covenant of good faith and fair dealing" that is "implied in every contract" as an independent basis for him to bring suit on his own behalf.  *See* Pl.'s Opp'n 16 (quoting *Waxman*, 222 F. Supp. 3d at 294-95).  But Rhodes cites, and the Court has found, no authority to support the proposition that when, as here, the plain terms of a contract bar a party from suing to enforce the contract, that same party can bring a quasi-contractual claim for breach of the implied covenant.  That stands to reason, as "[a] claim of breach of the covenant *is* a

theory of contractual breach . . . rather than a separate cause of action." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 261 F.R.D. 4, 9 (W.D.N.Y. 2009) (emphasis added) (citing cases). And it is well established that "no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995) (cleaned up); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (observing that the covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." (cleaned up)). To hold that Rhodes could proceed on a quasi-contract theory when the plain terms of the contract bar him from proceeding on a contract theory would impermissibly imply obligations that are inconsistent with the contractual relationship.

In sum, even if Rhodes qualifies as a Holder — a dubious proposition in itself — he may not bring his contract and quasi-contract claims. Accordingly, they must be and are dismissed.

## B. Tort Claims

Rhodes maintains that, even if he cannot bring contract or quasi-contract claims against BMS, he may still bring tort claims for conversion and tortious interference with economic advantage as the beneficial owner of CVRs. *See* Pl.'s Opp'n 16-18. As noted, the crux of Rhodes's tort claims is his allegation that BMS wrongfully caused the DTC to disable the CVR system and refused to instruct it to reactivate the system, thereby interfering with his "ability to exercise full control over his CVRs," Compl. ¶ 141, and "effectively organiz[e] with other CVR holders," *id.* ¶ 149. The problem with those claims is that they are entirely downstream of BMS's obligations under the CVR Agreement, and — under New York law, which applies here, *see* CVR Agrmt. § 1.10 — "a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch*

12

*v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012).  As Rhodes acknowledges, it is

Section 3.5 of the CVR Agreement that obliges BMS to maintain a system for the transfer and

exchange of CVRs through the DTC.  *See* Pl.'s Opp'n 22 ("Section 3.5(a) of the CVR

Agreement requires BMS to maintain a Security Register, and Section 3.5(b) governs the transfer

and exchange of CVRs, including through DTC.").  Rhodes identifies no legal duty owed by

BMS to beneficial owners independent of the CVR Agreement on which to base his claims.

That lack of independent duty is precisely what distinguishes this case from *Bayerische*

*Landesbank* and *Phoenix Light SF Ltd. v. Deutsche Bank National Trust Co.*, 172 F. Supp. 3d

700 (S.D.N.Y. 2016), on which Rhodes relies.  *See* Pl.'s Opp'n 17-18.[4]  In *Bayerische*

*Landesbank*, for example, the Second Circuit found that the defendant's status as a "portfolio

manager" established a legal duty to investors that was "independent of [its] contractual

obligations" to the plaintiff.  *See* 692 F.3d at 58-59.  Likewise, in *Phoenix Light*, the court

identified certain duties owed by the defendant based on its status as a "fiduciary" that were

independent of its contractual obligations.  *See* 172 F. Supp. 3d at 718.  No such duty exists here.

It follows that Rhodes's tort claims are "precluded as duplicative," *Bayerische Landesbank*, 692

F.3d at 58, and those claims (Counts IV and V) must be and are also dismissed.

## CONCLUSION

For the reasons stated above, BMS's motion to dismiss Rhodes's Complaint must be and

is GRANTED.  That leaves only Rhodes's cursory request for leave to amend his Complaint.

*See* Pl.'s Opp'n 10 n.6, 26.  Although leave to amend should be freely given "when justice so

---

[4]    Rhodes also cites *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190 (N.Y. 1987), but the Court of Appeals in that case affirmed the dismissal of tort claims on the grounds that the plaintiff failed to "allege[] the violation of a legal duty independent of the contract."  *Id.* at 194.

13

requires," FED. R. CIV. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). Here, the problems with Rhodes's dismissed claims are substantive, so amendment would be futile. *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases). Put differently, even if Rhodes could "obtain additional authorization" or "add[] a nominal plaintiff" to demonstrate that he is bringing suit in his capacity as a Holder, it would not cure the problems with his Complaint because the CVR Agreement bars Holders from bringing his claims. Pl.'s Opp'n 10 n.6. Finally, the Court granted Rhodes leave to amend in response to BMS's first motion to dismiss and explicitly warned that he would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 19. "Plaintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend . . . ." *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (collecting cases). Accordingly, Rhodes's request for leave to amend is DENIED.

The Clerk of Court is directed to terminate ECF No. 16, to enter judgment for BMS consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: May 12, 2026
New York, New York

_____
JESSE M. FURMAN
United States District Judge

14